# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 6, 2010 Session

## DAVID LEE WRIGHT EX REL. KAITLYN LEE WRIGHT v. ANITA J. WRIGHT ET AL.

**Appeal by Permission from the Court of Appeals, Middle Section**
**Circuit Court for Fentress County**
**No. 8136     John McAfee, Judge**

**No. M2008-01181-SC-R11-CV - Filed March 29, 2011**

We granted this appeal to determine the proper method for computing a reasonable attorney's fee when the attorney represents a minor. In this case, after the attorney obtained a $425,000 settlement for a minor injured in an automobile accident, the trial court awarded the attorney $141,666.66, or one-third of the recovery, pursuant to the terms of the attorney's contingent fee agreement with the minor's father. The court-appointed guardian ad litem appealed the fee award, and the Court of Appeals reversed. Upon remand, the trial court conducted an evidentiary hearing and determined that $131,000 would be a reasonable attorney's fee, and the Court of Appeals affirmed. Reviewing for an abuse of discretion, we hold that the trial court applied the correct legal standard by analyzing the ten factors set forth in Tennessee Supreme Court Rule 8, Rule of Professional Conduct 1.5(a). We further hold that the fee award was neither illogical, based on an erroneous assessment of the evidence, nor an injustice to the minor. We therefore affirm the judgment of the trial court.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed**

CORNELIA A. CLARK, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

James P. Romer, Jamestown, Tennessee, for the appellant, Kaitlyn Lee Wright, a minor, in his capacity as guardian ad litem.

Johnny V. Dunaway, LaFollette, Tennessee, for the appellee, David Lee Wright, parent and next friend of Kaitlyn Lee Wright, a minor.

John A. Day, R. Burke Keaty, II, and Phillip H. Miller, Nashville, Tennessee, for the Amicus Curiae, Tennessee Association for Justice.

**OPINION**

BACKGROUND

*Filing and Settlement of Action*

On May 12, 2005, nine-year-old Kaitlyn Lee Wright was seriously injured in an automobile accident. Marjorie Copley, Kaitlyn's paternal grandmother ("Grandmother"), was driving Kaitlyn home from school in Fentress County when Grandmother's vehicle collided head-on with another vehicle. Grandmother died in the collision. Kaitlyn sustained serious injuries and was admitted to the University of Tennessee Medical Center from May 12 to May 30, 2005, where she underwent multiple surgeries to repair her injuries. After her discharge, Kaitlyn completed a significant course of outpatient physical therapy and had a follow-up surgical procedure to remove hardware from her left ankle.[1] The medical expenses for Kaitlyn's treatment totaled $183,814.30.

At the time of Kaitlyn's accident, her parents were divorced. Since 2001, David Lee Wright ("Father") and Tracy Nivens ("Mother") have shared joint custody of Kaitlyn. On June 9, 2005, Father retained attorney Johnny V. Dunaway to pursue Kaitlyn's claim for personal injuries and executed a one-third contingent fee agreement with Dunaway. The fee agreement provided that, "[if] a claim is made on behalf of any infant or incompetent and if court rules or law requires, the fee will then be such as may be approved by the court." The next day, Father, in his capacity as Kaitlyn's parent and next friend, filed a complaint through counsel in Fentress County Circuit Court for common-law negligence and negligence per se. The complaint named as defendants Anita J. Wright, the driver of the other vehicle in the accident,[2] and Ellen Collins, the administratrix of Grandmother's estate. The complaint originally requested monetary damages of $250,000 but was later amended to request $500,000.

---

[1] The record does not definitively state the extent of Kaitlyn's recovery from her injuries. Kaitlyn has permanent, significant scars and may need additional surgery at some point to remove the remaining ankle hardware. Kaitlyn's attorney represented to the trial court, however, that Kaitlyn was "making some miraculous progress" and "doing extremely well" following her numerous surgeries, an outcome that counsel attributed to "the resiliency of youth."

[2] According to the record, Kaitlyn and Father are not related to Anita Wright. By an "Agreed Order" filed November 21, 2006, the parties agreed that Anita Wright was not at fault in the accident. Father's claims against her were ultimately dismissed with prejudice.

Mother retained a different attorney and filed her own personal injury action in Fentress County Circuit Court on June 23, 2005. In a November 29, 2005, hearing, Circuit Judge John McAfee dismissed Mother's action[3] and, citing the involvement of "competing parents," appointed James P. Romer as Kaitlyn's guardian ad litem in Father's suit.

On July 24, 2006, the parties settled the case during a judicial settlement conference presided over by Circuit Judge John A. Turnbull. According to a handwritten document entitled "Memo of Understanding—Mediated Settlement," Grandmother's estate agreed to pay $425,000 on behalf of Kaitlyn. In addition to this amount, Grandmother's estate agreed to pay all court costs, including the guardian ad litem's fee and deposition expenses in an amount not to exceed $5,000.[4] Each party would pay its own discretionary costs. The memo further provided that, "[a]fter payment of contractual attorney fees the Court will [be] requested to approve the minor's settlement to be invested long term (i.e., through a structured annuity)." The complaint would then be dismissed with prejudice.

*Challenge to Attorney's Fee and First Appeal*

On August 30, 2006, Dunaway faxed a proposed settlement order to counsel for Grandmother's estate and to Romer, inquiring whether they suggested changes or could approve the order as drafted. The proposed order provided for payment from the settlement of $141,666.66 to Dunaway for "contractual attorney fees,"[5] $3,021 to Dunaway for advanced expenses, and $62,517.74 to Blue Cross Blue Shield of Tennessee ("BCBS") for its subrogation claim for medical expenses. From the $217,794.60 of net proceeds, $17,794.60 would be deposited into a certificate of deposit held in trust and managed by Father for any of Kaitlyn's emergency needs that might arise before she reached majority. The remaining $200,000 would be invested long term in a court-approved structured annuity or other investment. On September 8, 2006, not having received requested feedback from other counsel about the proposed order, Dunaway prepared a motion for approval of a minor settlement and advised counsel for Grandmother's estate and Romer that he would appear

---

[3] Mother did not appeal this dismissal.

[4] Romer was ultimately paid $2,716 by Grandmother's liability insurer for services rendered and deposition expenses incurred as guardian ad litem through the judicial settlement conference. This payment was separate from the $425,000 settlement.

[5] The $141,666.66 amount is equal to one-third of $425,000.

in Fentress County Circuit Court on September 25, 2006, for court approval of the settlement.[6]

By letter dated September 11, 2006, Romer recommended to Dunaway that a hearing take place on the amount of the attorney's fee. Dunaway replied to Romer the same day, maintaining that the amount of the attorney's fee was outside the scope of Romer's duties as guardian ad litem. On September 15, 2006, Romer filed a response to the motion to approve the minor's settlement, requesting a hearing to review the proposed order and to determine a reasonable attorney's fee for Dunaway.

During the ensuing hearing before Judge McAfee, Romer argued that, under Tennessee law, a next friend cannot bind a minor by contracting with counsel for attorney's fees and that the trial court, when setting a reasonable attorney's fee in a minor settlement, should exercise its discretion using the factors set forth in Tennessee Supreme Court Rule 8, Rule of Professional Conduct ("RPC") 1.5(a)(1)-(10). In response, Dunaway argued that, because the contingent nature of the fee was "one of the major factors to be considered" and because he invested "a lot of work" in the case, he should receive the contracted-for contingency fee. In its ruling from the bench, the court stated that it had "considered" the RPC 1.5 factors, but made no specific findings as to any of them. The court then found that Dunaway's one-third contingency fee was not "unreasonable in any way." Noting that, if Kaitlyn could have contracted with an attorney, "more than likely that lawyer would have charged a third," the trial court stated that it "fully and firmly support[ed] the free market approach" and "ha[d] no intentions of interfering with this."

Accordingly, on September 25, 2006, the trial court entered a judgment approving the settlement. The trial court awarded Dunaway "contractual attorney fees" of $141,666.66 and distributed the remaining settlement proceeds as stated in the proposed order that Dunaway had circulated. On November 9, 2006, the trial court issued supplemental orders concluding that the $141,666.66 contingency fee on a total recovery of $425,000 was a fair and reasonable fee and directing the payment of that fee from the settlement proceeds.

Following the entry of the final judgment on January 18, 2007, Romer appealed the amount of the attorney's fee.[7] The Court of Appeals reversed the fee award, "remanded to the trial court for a full hearing," and directed the trial court to consider and make findings

---

[6] Although both the motion and notice were dated September 8, 2006, the motion was file-stamped on September 21, and the notice on September 13.

[7] Prior to the entry of final judgment, Romer filed a motion for permission to file an interlocutory appeal following the trial court's September 25, 2006 order, and then moved to amend that motion following the supplemental orders of November 9, 2006. In its final order, the trial court denied both motions.

on all the relevant RPC 1.5 factors. Wright ex rel. Wright v. Wright, No. M2007-00378-COA-R3-CV, 2007 WL 4340871, at *6-7 (Tenn. Ct. App. Dec. 12, 2007) ("First Appeal"). The intermediate appellate court reaffirmed the legal rule that a next friend representing a minor cannot bind the minor by a contract with counsel for the amount of attorney's fees. Id. at *4. The Court of Appeals concluded that the September 25, 2006 hearing was deficient because of the absence of proof concerning the time Dunaway spent on the case, lack of specific findings concerning each of the RPC 1.5(a) factors, and failure to acknowledge that Dunaway bore the burden of establishing the reasonableness of his fee request. Id. at *6. The intermediate appellate court concluded that the trial court erred in "believ[ing] that the contingent fee agreement trumped all the other relevant factors set out in RPC 1.5(a)." Id.

*Remand Hearing and Second Appeal of Attorney's Fee*

After the Court of Appeals' opinion reversing the fee award and remanding to the trial court, Dunaway filed a motion in Fentress County Circuit Court for approval of his attorney's fee.[8] He attached an affidavit detailing the time and legal services that he had rendered in the case. Judge McAfee conducted an evidentiary hearing on April 9, 2008, during which he heard Dunaway's testimony and admitted exhibits into evidence.[9] Counsel for Grandmother's estate did not participate in the hearing or take a position on Dunaway's fee. Dunaway's testimony and the accompanying exhibits establish the following facts.

According to Dunaway's affidavit, he spent 144.4 hours and advanced $3,031.05 of expenses[10] on Kaitlyn's behalf; he routinely litigated personal injury cases on a contingent fee basis of one-third of the recovery; and he handled other litigation on an hourly basis, charging $400 per hour. Ten hours of work in Kaitlyn's case were performed by Dunaway's associate, Mark Orr, whose rate was $150 per hour in hourly litigation. On cross-examination by Romer, Dunaway admitted that the affidavit inadvertently contained duplicate entries for Dunaway's appearance at the November 29, 2005, hearing on the motion to dismiss Mother's personal injury action.[11]

---

[8] Although Dunaway's motion and accompanying affidavit were dated March 28, 2008, they were not stamped "Filed" by the circuit court clerk until April 10, 2008, the day after the trial court heard Dunaway's motion.

[9] Dunaway was deposed prior to the hearing. However, the deposition transcript was not available at the time of the hearing, and it is not included in the record on appeal.

[10] The record does not explain why this number is $10.05 higher than the amount of expenses actually paid to Dunaway out of Kaitlyn's $425,000 settlement.

[11] One such entry was for 5.0 hours, and the other entry was for 6.0 hours.

Dunaway testified that he had been practicing law for thirty-four years and had cases pending in sixteen different East Tennessee counties. He testified that he tries the most jury cases of any attorney in the Eighth Judicial District. Dunaway accepts most cases on an hourly basis but litigates personal injury cases on a contingent fee basis. When retained by a client, Dunaway discloses both that his hourly rate is $400 per hour and that he knows of no other attorney in the district whose hourly rate is as high. The parties stipulated that attorneys practicing in Fentress County typically charge $150-200 per hour in hourly cases and charge a one-third contingency fee for representing adult plaintiffs in personal injury actions.

Dunaway had previously represented Father in his divorce from Mother and in several other litigation matters over a period of approximately ten years. For Kaitlyn's case, Dunaway executed a written contingent fee agreement with Father, who could not have funded the litigation personally without taking out a loan specifically for that purpose. Furthermore, Dunaway advanced all expenses to develop the case.

In developing Kaitlyn's case, Dunaway reviewed, analyzed, and summarized Kaitlyn's medical treatments and medical expenses. Dunaway subsequently moved to amend the complaint to double the demand for damages because Kaitlyn's injuries were more severe than he originally realized. While investigating the case, Dunaway concluded that he would be unable to establish liability against Anita Wright because Kaitlyn had no recollection of the accident, Grandmother was deceased, and the police investigative report placed fault with Grandmother. Dunaway determined that the maximum possible insurance recovery was the $50,000 policy limits of Grandmother's liability coverage, a sum well below the amount of damages that Kaitlyn sustained. Accordingly, Dunaway turned to the assets of Grandmother's estate, which consisted primarily of real property. Based on his review of the property and probate records, Dunaway determined that the estate had sufficient assets to satisfy a substantial judgment.

Dunaway learned that Grandmother's estate had filed a petition in Fentress County Chancery Court on April 25, 2006, to obtain court approval for a private sale of the estate's property. Concerned that an unsupervised private sale might significantly reduce the assets of the estate, Dunaway appeared before the chancellor on June 20, 2006, to advise the court of Kaitlyn's personal injury action pending against the estate. That same day, the chancellor entered an order allowing the sale of the property subject to review and supervision by the court. If the court did not approve the sale, the order directed a public auction, again subject to court approval. The estate subsequently withdrew its petition to sell the real property and

ultimately contributed $375,000 to the settlement.[12]  Dunaway's affidavit indicates that he spent 9.9 hours responding to the petition to sell the estate's real property.

In addition to settling the action against the estate, Dunaway negotiated with BCBS concerning the amount of its subrogation interest for Kaitlyn's medical expenses.  BCBS agreed to reduce its $183,814.30 claim down to $62,517.74.[13]  Father invested the net recovery of approximately $220,000 in certificates of deposit with an initial negotiated interest rate of approximately 5.5%.[14]

Romer submitted an affidavit detailing his expenses, time spent, and services rendered as guardian ad litem subsequent to the judicial settlement conference.  His affidavit reflected a balance still due of $10,369.62.

The trial court issued its opinion from the bench.  The court addressed each of the ten factors in RPC 1.5.  Concerning the first factor—the time and labor required, the novelty and difficulty of the questions, and the skill required to perform the services properly—the court acknowledged the "substantial amount of hours" reflected on Dunaway's affidavit.  The court excluded the time Dunaway spent litigating the Overton County Juvenile Court petition but included the time spent litigating the Fentress County Chancery Court petition to sell the assets of Grandmother's estate.  Ultimately, the court did not make a finding as to the exact number of hours that Dunaway spent on Kaitlyn's case but observed that, if those hours had been billed at Dunaway's hourly rate, the total would "roughly . . . be around a fifty thousand dollar fee."  From the beginning of the representation, Dunaway "immediately began the

---

[12] This amount, plus the liability insurer's payment of the $50,000 policy limits, constitutes the sum of the $425,000 settlement.  Pursuant to a September 14, 2006, letter, counsel for Grandmother's estate informed Dunaway that the estate would pay the settlements with a bank option rather than through the sale of properties.  The record is unclear whether the insurance company paid the $50,000 into Grandmother's estate or directly to Kaitlyn's representatives.

[13] The testimony and exhibits from the April 9, 2008, hearing do not identify the exact amount of the negotiated subrogation interest.  Instead, that amount appears in the September 25, 2006, judgment approving the settlement.  Romer did not appeal the amount of the payment to BCBS.

[14] The record also reflects that, on June 3, 2005, shortly after Kaitlyn's release from the hospital, Mother filed a petition in Overton County Juvenile Court to have Kaitlyn declared dependent and neglected by Father.  This petition was served on Father the day after he retained Dunaway for the personal injury case. Dunaway prepared pleadings in response to the petition and ultimately obtained an agreed order of voluntary dismissal by persuading opposing counsel that the Overton County court had no jurisdiction because, although Mother lived there, Father and Mother litigated their divorce in Fentress County, where post-divorce matters were also pending.  Dunaway spent 11.2 hours responding to the Overton County Juvenile Court petition.

process of preparing this case for trial" by, for example, reviewing and summarizing Kaitlyn's medical records. Although other, less experienced lawyers might have settled for the insurance policy limits, Dunaway determined the value of the case and, by investigating the assets of Grandmother's estate, located "deep pockets" to provide a settlement commensurate with that value. By settling the case, Dunaway avoided the uncertainty of submitting the case to a jury.

The court concluded that the second factor—the likelihood, if apparent to the client, that accepting the particular employment would preclude other employment—"may or may not be a factor." The court did note Dunaway's testimony that any work on Kaitlyn's case precluded him from other personal injury cases paying a one-third contingency fee or hourly matters charged at his $400 per hour rate.

Concerning the third factor—the fee customarily charged in the area for similar legal services—the trial court acknowledged the legal rule that the parties could not bind a juvenile by a contract for attorney's fees. However, the trial court also stated it was "important" that lawyers in Fentress County customarily charge a one-third contingency fee in personal injury cases.

Concerning the fourth factor—the amount involved and results obtained—the court concluded the results were "very good" and reflected "good lawyering . . . to get this kind of money."

Concerning the fifth factor—the time limitations imposed by the client or circumstances—the trial court did not find that any such limitations existed.

Concerning the sixth factor—the nature and length of the professional relationship with the client—the court found that Dunaway had a ten-year professional relationship with Father and observed that Father "is a professional and an educated person, and obviously knew what he was doing when he contracted with Mr. Dunaway to represent his daughter."

Concerning the seventh factor—the lawyer's experience, reputation, and ability—the trial court commended Dunaway in all three areas, noting that Dunaway was "especially" well respected in Fentress County and by the court. The trial court noted Dunaway's thirty-four years of experience practicing law and recalled that Dunaway represented "most" of the plaintiffs in jury trials before the court.

Concerning the eighth factor—whether the fee is fixed or contingent—the court found that the fee was contingent.

Concerning the ninth factor—prior advertisements or statements by the lawyer with respect to the fee charged—the trial court concluded that it "d[id]n't think that's an issue." The court did reiterate that Father was "an educated man" and, based on the prior professional relationship, was "reasonable" to retain Dunaway for Kaitlyn's case.

Concerning the tenth factor—whether the fee agreement is in writing—the court found that the agreement was in writing and admitted it into evidence.

After reviewing the ten factors, the trial court ruled that $131,000 was a fair and reasonable fee for services Dunaway rendered on Kaitlyn's behalf. The trial court made this award "based upon the evidence presented . . . , based upon the practice, based upon the arrangements, based on everything, the totality of the circumstances, [and] based upon the factors listed." Accordingly, the court directed Dunaway to reimburse $10,000 from the original fee award to Father, who would then be required to pay that amount to Romer for services rendered as guardian ad litem subsequent to the settlement conference. The trial court memorialized this ruling in a written order filed May 2, 2008, and entered the final judgment that same day.[15]

Romer again appealed the amount of the attorney's fee. This time, the Court of Appeals affirmed Dunaway's $131,000 fee award, holding that the trial court did not abuse its discretion "after its thorough analysis of the applicable factors" from RPC 1.5. Wright ex rel. Wright v. Wright, No. M2008-01181-COA-R3-CV, 2009 WL 3246459, at *5 (Tenn. Ct. App. Oct. 8, 2009) ("Second Appeal"). The intermediate appellate court rejected Romer's argument that the number of hours times a reasonable hourly rate should be "the 'predominant factor' in setting a reasonable fee." Id. at *3.

Romer then sought this appeal, challenging the reasonableness of Dunaway's $131,000 fee and asking the Court to modify the application of RPC 1.5(a) for determining attorney's fees in cases involving minors.[16]

---

[15] Out of the original fee award of $141,666.66, the trial court provided no direction concerning the proper disposition of the $666.66 left over after the payment of Dunaway's $131,000 fee and reimbursement of $10,000 to Father, who would then pay Romer's guardian ad litem fee.

[16] In the Second Appeal, the Court of Appeals remanded to the trial court to address Romer's request for attorney's fees and expenses incurred in that appeal. Wright, 2009 WL 3246459, at *6. In his brief to this Court, while asking us not to disturb the $10,000 award for fees and expenses in the First Appeal, Romer voluntarily waives the reimbursement for his fees and expenses in the Second Appeal and the appeal to this Court.

## STANDARD OF REVIEW

The trial court's determination of a reasonable attorney's fee is "a subjective judgment based on evidence and the experience of the trier of facts," United Med. Corp. of Tenn., Inc. v. Hohenwald Bank & Trust Co., 703 S.W.2d 133, 137 (Tenn. 1986), and Tennessee has "no fixed mathematical rule" for determining what a reasonable fee is. Killingsworth v. Ted Russell Ford, Inc., 104 S.W.3d 530, 534 (Tenn. Ct. App. 2002). Accordingly, a determination of attorney's fees is within the discretion of the trial court and will be upheld unless the trial court abuses its discretion. Kline v. Eyrich, 69 S.W.3d 197, 203 (Tenn. 2002); Shamblin v. Sylvester, 304 S.W.3d 320, 331 (Tenn. Ct. App. 2009). We presume that the trial court's discretionary decision is correct, and we consider the evidence in the light most favorable to the decision. Henderson v. SAIA, Inc., 318 S.W.3d 328, 335 (Tenn. 2010); Keisling v. Keisling, 196 S.W.3d 703, 726 (Tenn. Ct. App. 2005). The abuse of discretion standard does not allow the appellate court to substitute its judgment for that of the trial court, Williams v. Baptist Mem'l Hosp., 193 S.W.3d 545, 551 (Tenn. 2006); Myint v. Allstate Ins. Co., 970 S.W.2d 920, 927 (Tenn. 1998), and we will find an abuse of discretion only if the court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party." Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008); see also Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010).

## ANALYSIS

This case presents a question of first impression: how trial courts should determine a "reasonable" attorney's fee when the attorney represents a minor. We begin by discussing a question we have addressed frequently: how the trial court would determine a "reasonable" attorney's fee if Kaitlyn were an adult.

Currently and at the time relevant to this litigation, this issue is governed by RPC 1.5, which specifically addresses attorney fees. It provides:

> (a) A lawyer's fee and charges for expenses shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) The fee customarily charged in the locality for similar legal services;

(4) The amount involved and the results obtained;

(5) The time limitations imposed by the client or by the circumstances;

(6) The nature and length of the professional relationship with the client;

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) Whether the fee is fixed or contingent;

(9) Prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) Whether the fee agreement is in writing.

Tenn. Sup. Ct. R. 8, RPC 1.5.[17] While this Court has not reviewed the reasonableness of an attorney's fee since the adoption of RPC 1.5, these are neither new nor novel considerations in the determination of a reasonable attorney's fee. Most recently, Tennessee's Disciplinary Rule ("DR") 2-106(B) set forth the following eight factors as guides in determining the reasonableness of a fee:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

Tenn. Sup. Ct. R. 8, DR 2-106(B) (2002); see also Connors v. Connors, 594 S.W.2d 672, 676-77 (Tenn. 1980). While acknowledging the importance of factors specified in a code

---

[17] Effective January 1, 2011, we amended RPC 1.5. This amendment added preliminary language prohibiting any agreement, charge, or collection of an unreasonable fee or expense amount, but the factors for determining a reasonable fee listed in subpart (a)(1)-(10) remained the same. The amendment also added a comment clarifying that the stated factors are not exclusive and each factor may not be relevant in every case. Another new comment explained that contingent fees are, like any other fee, subject to the reasonableness standard of RPC 1.5(a), based upon consideration of the relevant factors.

of ethics, this Court has also cautioned that "ultimately the reasonableness of the fee must depend upon the particular circumstances of the individual case." White v. McBride, 937 S.W.2d 796, 800 (Tenn. 1996) (citing Hail v. Nashville Trust Co., 212 S.W.2d 51 (Tenn. Ct. App. 1948)).

Our Court of Appeals has consistently maintained that the factors governing the determination of a "reasonable" attorney's fee in cases involving minors are the same as in cases involving adults. See Shoughrue v. St. Mary's Med. Ctr., 152 S.W.3d 577, 585-86 (Tenn. Ct. App. 2004) (explaining that trial court applied the correct legal standard by implicitly considering the RPC 1.5 factors); Hail, 212 S.W.2d at 56 (considering a set of factors similar to those ultimately codified in RPC 1.5). And, a survey of case law from other jurisdictions indicates that many courts have used the same multi-factor analysis to determine a reasonable fee, whether the case involves a minor or an adult. E.g., Pellegrin v. Nat'l Union Fire Ins. Co. of Pittsburgh (In re Abrams & Abrams, P.A.), 605 F.3d 238, 244 (4th Cir. 2010); Green v. Nevers, 111 F.3d 1295, 1299, 1303 (6th Cir. 1997); Hoffert v. Gen. Motors Corp., 656 F.2d 161, 166 (5th Cir. Unit A Sept. 1981); Holbrook v. Andersen Corp., 756 F. Supp. 34, 38 & n.7 (D. Me. 1991); Donnarumma v. Barracuda Tanker Corp., 79 F.R.D. 455, 461-62 (C.D. Cal. 1978); Madison Cnty. Dep't of Human Res. v. T.S. ex rel. F.M., 53 So. 3d 38, 54 (Ala. 2010) (opinion on return to second remand); Roos v. Hirsch (In re Conservatorship of Fallers), 889 P.2d 20, 22 (Ariz. Ct. App. 1994); Padilla v. McClellan, 113 Cal. Rptr. 2d 680, 685 (Ct. App. 2001); Iskander v. Columbia Cement Co., 469 A.2d 103, 106, 108-09 (N.J. Super. Ct. Law Div. 1983), aff'd, 484 A.2d 353 (N.J. Super. Ct. App. Div. 1984); In re Settlements of Betts, 587 N.E.2d 997, 1002-03 (Ohio Ct. Com. Pl. 1991); Sneed v. Sneed, 681 P.2d 754, 756-57 (Okla. 1984); In re Trust Estate of LaRocca, 246 A.2d 337, 339 (Pa. 1968); Int'l Dairy Queen, Inc. v. Matthews, 126 S.W.3d 629, 631-32 (Tex. App. 2004); In re Settlement/Guardianship of AGM & LLM, 223 P.3d 1276, 1283-84 (Wash. Ct. App. 2010); Statler v. Dodson, 466 S.E.2d 497, 505-06 (W. Va. 1995).[18] Many of these jurisdictions, like Tennessee, have a rule of professional conduct based on the corresponding provision in the ABA's Model Rules, while others have developed their tests under the common law. Although all jurisdictions do not use precisely the same factors to compute a reasonable fee, each jurisdiction cited here considers at least some of the factors found in our RPC 1.5, and considers those factors whether the attorney represents a minor or an adult.

Nevertheless, the courts in Tennessee and in these other jurisdictions also assume a special responsibility to protect a minor's interests. See, e.g., Nashville Trust Co. v. Lebeck,

---

[18] Each of these cases discusses the computation of attorney's fees in cases involving a minor. The fact that the reasonable fee analysis remains the same in cases involving adults is implied from the citation to a court rule or rule of professional conduct of general application, or to another case using the same analysis to compute a reasonable fee in a case without any minors.

270 S.W.2d 470, 475 (Tenn. 1954), abrogated on other grounds by Cracker Barrel Old Country Store, Inc. v. Epperson, 284 S.W.3d 303 (Tenn. 2009); Wilson v. Mullen, 11 Tenn. App. 319, 336 (1930); cf. Tuetken v. Tuetken, 320 S.W.3d 262, 271 (Tenn. 2010) (explaining, in the child custody context, that "Tennessee statutes . . . impose a duty on trial courts to protect the best interests of children"); see also Sneed, 681 P.2d at 756 ("Cases involving minors impose a duty upon the trial court to protect the child's interest."); Settlement/Guardianship of AGM, 223 P.3d at 1283 (describing special procedures for trial court's exercise of discretion over attorney fees in settlements on a minor's behalf). As one federal court has explained, where the plaintiffs pay the attorney's fee out of their recovery:

> [t]he Court has a responsibility in such a case to oversee the fairness of the fee in a more general sense. This is especially true when the plaintiffs are minors and are hence in no position to judge for themselves the value of the services rendered by their attorneys or to protect fully their own interests and needs in the division of a settlement award negotiated on their behalf. . . . These concerns also require the court to give special scrutiny to the claim for attorney fees. In this situation, the Court must consider not only the fair value of the services rendered by plaintiffs' counsel, but also the needs, both present and future, of the [minor] plaintiffs who are the Court's special responsibility.

Friends for All Children, Inc. v. Lockheed Aircraft Corp., 567 F. Supp. 790, 812-13 (D.D.C. 1983) (internal citations omitted). Indeed, Tennessee has legislation pertinent to this issue:

> In any action, claim or suit in which a minor . . . is a party or in any case of personal injury to a minor . . . caused by the alleged wrongful act of another, the court in which the action, claim, or suit is pending . . . has the power to approve and confirm a compromise of the matters in controversy on behalf of the minor . . . . If the court deems the compromise to be in the best interest of the minor . . . , any order or decree approving and confirming the compromise shall be binding on the minor . . . .

Tenn. Code Ann. § 34-1-121(b) (2007); see also id. § 29-34-105(a) (Supp. 2010) (requiring a chambers hearing attended by minor and legal guardian for any tort claim settlement involving a minor that exceeds $10,000). As part of the settlement approval process, the trial court also determines the amount of fees for the attorney representing the minor plaintiff. See Shoughrue, 152 S.W.3d at 585.

While we reaffirm the longstanding rule in Tennessee that a next friend representing a minor cannot contract with an attorney for the amount of the attorney's fee so as to bind the minor, City of Nashville v. Williams, 82 S.W.2d 541, 541 (Tenn. 1935) (citing Roberts

v. Vaughn, 219 S.W. 1034, 1036 (Tenn. 1920)); Shoughrue, 152 S.W.3d at 585, we also recognize that the attorney is still entitled to a "reasonable" fee. Williams, 82 S.W.2d at 541; Shoughrue, 152 S.W.3d at 585. We consider, therefore, whether a trial court should add to or adjust its analysis of the factors set forth in RPC 1.5 when determining the reasonableness of an attorney's fee earned in conjunction with representing the interests of a minor.

*Lodestar*

Romer argues that we should make the time and labor required in conjunction with the representation the "bedrock" of the reasonable fee analysis. Cf. Donnarumma, 79 F.R.D. at 465-66; T.S. ex rel. F.M., 53 So. 3d at 54; Settlements of Betts, 587 N.E.2d at 1002. Specifically, Romer directs our attention to the "lodestar" method for computing a reasonable attorney's fee. In the lodestar calculation, the court multiplies the number of hours that the attorney has reasonably expended on the case times a reasonable or customary hourly rate. United Med. Corp., 703 S.W.2d at 137; Settlement/Guardianship of AGM, 223 P.3d at 1286 n.16. In its discretion, the court may make some adjustment, usually as a percentage of the hourly rate, to reflect other factors such as those found in our RPC 1.5(a), including the contingent nature of success, the quality of the attorney's work, and the results obtained. Id.; cf. Friends for All Children, 567 F. Supp. at 809. As an example, Romer cites the practice in Washington State, where courts first conduct a multi-factor analysis much like our RPC 1.5(a) to determine whether a requested fee is reasonable and then, if the requested fee is unreasonable, use the lodestar to compute a reasonable fee. See Settlement/Guardianship of AGM, 223 P.3d at 1286 & n.16.

In United Medical Corp., this Court refused to adopt the lodestar approach in the context of determining a reasonable attorney's fee in a collection action. 703 S.W.2d at 137. We reasoned that the existing multi-factor analysis under DR 2-106 already included the "time expended and the customary hourly charges in the locality."[19] Id.; cf. Tenn. Sup. Ct. R. 8, RPC 1.5(a)(1) & (3). Acknowledging this Court's previous rejection of the lodestar approach, Romer asks us to reconsider in cases involving minors.

Relying on the lodestar calculation alone to determine a reasonable attorney's fee is problematic, however. The Supreme Court of Oklahoma has ably explained the flaw with making the number of hours the predominant consideration in computing a reasonable

---

[19] But see McDonnell Dyer, P.L.C. v. Select-O-Hits, Inc., No. W2000-00044-COA-R3-CV, 2001 WL 400386, at *7 (Tenn. Ct. App. Apr. 20, 2001). Citing a Court of Appeals case decided shortly after United Medical Corp., this unpublished opinion stated that "Tennessee courts . . . traditionally determine[] the reasonable value of an attorney's services by considering the number of hours billed and the lawyer's customary hourly rate." Id.

attorney's fee: "[t]he time and energy expended in the performance of client services are essential elements which must be considered in setting reasonable fees—but, if time is the singular calculation, inexperience, inefficiency, and incompetence may be rewarded while skillful and expeditious disposition of litigation is penalized unfairly." Adams v. Unterkircher, 714 P.2d 193, 197 (Okla. 1985); see also Settlements of Betts, 587 N.E.2d at 1004 (reasoning that an experienced and skilled attorney can accomplish tasks in shorter amount of time). The ability to achieve such a "skillful and expeditious disposition of litigation" with fewer hours may, in fact, produce a greater recovery for the client.

Furthermore, as the Amicus Curiae explains, adopting the lodestar to determine the attorney's fee in cases involving a minor may result in a greater recovery for Kaitlyn in this case, but there is no guarantee that it would bring a greater recovery for other minors in future cases. To the contrary, adopting the lodestar may instead create pressure to accept low settlement offers early in the case, regardless of whether early settlement is in the minor's best interests. That way, the minor's next friend minimizes the risk of attorney's fees accumulating during the litigation and consuming whatever greater recovery the minor might obtain by holding out for a later, higher recovery. Also, tying the amount of the fee award so closely to the number of hours spent on the case may perversely incentivize working additional hours on a case for the purpose of obtaining a higher fee. In any event, the lodestar has the potential to lead to lower total and net recoveries for minors, a result inconsistent with the courts' duty to protect their best interests.

Ultimately, we decline to require that trial courts rely solely or even primarily on the lodestar computation in determining a reasonable attorney's fee involving minors. As we reasoned in United Medical Corp., our existing multi-factor analysis already includes the time and labor involved in the case and the fee customarily charged in the locality.[20] 703 S.W.2d at 137. We decline to make those factors the paramount or exclusive considerations because RPC 1.5(a) articulates a number of other factors that are also important to determining a reasonable attorney's fee. Regardless of the approach used, "the determination of what constitutes a reasonable fee is still a subjective judgment based on evidence and the experience of the trier of facts," id., and "the reasonableness of the fee must depend upon the particular circumstances of the individual case." White, 937 S.W.2d at 800. We disagree that emphasizing the lodestar will cause trial courts to exercise that case-by-case discretion more effectively when minors are involved.

---

[20] Since the United Medical Corp. decision in 1986, we added the lawyer's prior communications regarding fees charged, another factor potentially relevant to determining the reasonable hourly rate in a particular case. See Tenn. Sup. Ct. R. 8, RPC 1.5(a)(9).

Our decision should not be construed as diminishing the significance of the attorney's time and labor in determining a reasonable attorney's fee. We anticipate that the attorney's time and labor will always be relevant in cases where the court is asked to determine a reasonable fee.[21] As the Court of Appeals observed in the First Appeal, a record of an attorney's fee award contains a "striking void" if there is no "precise information as to the amount of time spent on the case" by the attorney requesting a fee. See Wright, 2007 WL 4340871, at *6 & n.6. An affidavit such as the one that Dunaway submitted for the remand hearing in this case—which detailed how much time he spent on the case, what work he accomplished during that time, and when he spent that time—helps the trial court analyze several factors relevant to the determination of a reasonable attorney's fee. It not only provides the amount of time and labor that the case required, but also is useful for assessing the difficulty of the questions presented, the skills required, and the time constraints that the attorney faced. Accordingly, an attorney representing a minor should keep a record of time spent on the minor's case, even if that attorney does not ordinarily keep track of time as part of the attorney's practice.[22]

*Percentage Cap*

Romer also asks us to consider imposing a percentage cap on the attorney's recovery in cases involving the representation of a minor. Romer points out that Tennessee imposes percentage caps on attorney's fees in medical malpractice actions,[23] see Tenn. Code Ann. §

---

[21] By contrast, some factors will, perhaps, not be relevant in all cases. In the present case, for example, the trial court found that "time limitations imposed by the client or by the circumstances" were not applicable to the fee determination because the evidence indicated that no such time limitations existed.

[22] Knowing the number of hours spent on the case also enables the court, in its discretion, to cross-check the reasonableness of a fee by computing the effective hourly rate. For example, in White, we affirmed the lower courts' refusal to enforce a one-third contingency agreement where recovery under the contract would have compensated the attorney at an hourly rate more than six times as high as, and thus "grossly in excess of . . . the upper end of 'the fee customarily charged in the locality for similar services.'" 937 S.W.2d at 801 (quoting Tenn. Sup. Ct. R. 8, DR 2-106(B)(3)).

We do not mandate that trial courts compute the effective hourly rate in every case (just as we hold that trial courts are not required to use the lodestar). We simply point out that the effective hourly rate computation may be a useful tool for a trial court determining a reasonable fee in the particular circumstances of an individual case. Most importantly, whether or not trial courts use this tool, the attorney seeking a fee needs to keep a record of the time spent on the case so the trial court can consider the time and labor required to determine what is a reasonable fee.

[23] Where the plaintiff in a medical malpractice action has contracted with an attorney on a contingency fee basis, the court will grant a fee no greater than one-third of the damages awarded to the

(continued...)

29-26-120 (2000), and workers' compensation cases,[24] see id. § 50-6-226 (2008). Federal law likewise imposes fee caps in Social Security cases.[25] See 42 U.S.C. §§ 406(a)(2)(A), 1383(d)(2)(A) (2003 & Supp. 2010).

Other states impose caps on fees more broadly. For example, in New Jersey, the attorney's fee in tort actions is controlled by a graduated scale tied to the amount of the recovery. See N.J. R. Ct. 1:21-7(c). Similarly, for contingency fees in tort cases, Florida has imposed a graduated scale tied to both the amount of the recovery and the stage at which the case is resolved. R. Regulating Fla. Bar 4-1.5(f)(4)(B)(i). The language of the Florida rule does not distinguish between cases involving adults and cases involving minors.[26]

If we were to follow these jurisdictions and specify a percentage of what an attorney could recover in a case involving a minor, we would depart from our existing law that "ultimately the reasonableness of the fee must depend upon the particular circumstances of the individual case." White, 937 S.W.2d at 800. Prescribing a fee structure would tend to result in similar fees being awarded in cases with different factual and procedural histories.[27] Cf. McCombs v. N.J. State Police, 576 A.2d 349, 351 (N.J. Super. Ct. Law Div. 1990) (explaining that difficulty of establishing liability and quality of legal services rendered are

---

[23](...continued)
plaintiff. Tenn. Code Ann. § 29-26-120. In determining the fee, the court considers the time and effort the attorney devoted to the litigation, the complexity of the claim, "and other pertinent matters." Id.

[24] In workers' compensation proceedings, attorney's fees for counsel representing employees cannot exceed twenty percent of the amount of the claimant's award, excluding medical costs voluntarily paid by the employer or its insurer. Tenn. Code Ann. § 50-6-226(a)(1), (2)(A). In a case proceeding to trial, the employee's attorney must apply for approval of a proposed attorney's fee, and any award exceeding $10,000 requires court findings concerning the RPC 1.5 factors that justify the fee. Id. § 50-6-226(a)(2)(C).

[25] An attorney who obtains a favorable determination of past-due benefits for a claimant may recover the lesser of twenty-five percent of the past-due benefits or $6,000. See 42 U.S.C. § 406(a)(2)(A); cf. Maximum Dollar Limit in the Fee Agreement Process, 74 Fed. Reg. 6080, 6080 (Feb. 4, 2009) (increasing the maximum dollar amount for fee agreements to $6,000). Essentially the same scale is also implemented in 42 U.S.C. § 1383(d)(2).

[26] Pursuant to their inherent power to protect minors, however, Florida courts have the discretion not to bind a minor to a contract for legal services. See Wilson v. Griffiths, 811 So. 2d 709, 713 (Fla. Dist. Ct. App. 2002).

[27] If most cases resulted in courts awarding fees equal to the percentage cap, this pattern would run contrary to the principle that the percentage recovery should be lower as the amount of the recovery increases. See Werner v. Levine, 276 N.Y.S.2d 269, 272 (Sup. Ct. 1967); Abel v. Tisdale, 619 P.2d 608, 612 (Okla. 1980).

not relevant to whether the New Jersey fee cap applies). We are also not persuaded by Romer's argument that, because minors are innocent and vulnerable, they are similarly situated to disabled Social Security claimants and injured workers and, thus, deserve similar rules governing attorney's fees. Such an analogy overlooks the reality that the fee caps in our workers' compensation law and the federal Social Security law resulted from legislative enactment, rather than the exercise of judicial discretion based on ethical guidelines. In the absence of legislation creating such a fee schedule, we decline to develop our own and further decline the invitation to add a percentage cap or guideline to the factors listed in RPC 1.5(a).[28]

### Contingency Fee

In contrast to Romer, the Amicus Curiae urges us to place great weight on the risks inherent in a contingency fee agreement, arguing that such fee agreements should be enforced when negotiated on behalf of a minor where the same fee would be anticipated were the plaintiff an adult. We recognize, of course, that contingency arrangements allow clients who cannot "pay a reasonable fixed fee to obtain competent representation." Alexander v. Inman, 903 S.W.2d 686, 696 (Tenn. Ct. App. 1995). Furthermore, unlike hourly billing, contingency fee arrangements shift to the attorney some or all of the risk that the client's claim will result in no recovery. Id.

In the context of cases involving minors, however, a proposal to enforce a contingency fee agreement automatically is contrary to law. In this state a next friend representing a minor cannot contract with an attorney for the amount of the attorney's fee so as to bind the minor. Williams, 82 S.W.2d at 541; Shoughrue, 152 S.W.3d at 585. Therefore, the trial court should not place weight on the nature of the fee agreement and instead should review the case on the premise that there is no enforceable fee contract. In other words, the proper

---

[28] In addition to the percentage cap in New Jersey, Romer also directs our attention to Rule 71(I) of the Rules of Superintendence for the Courts of Ohio, which states:

> Prior to a fiduciary entering into a contingent fee contract with an attorney for services, an application for authority to enter into the fee contract shall be filed with the court, unless otherwise ordered by local court rule. The contingent fee on the amount obtained shall be subject to approval by the court.

Romer suggests this contract pre-approval procedure might be of some advantage in Tennessee, if courts were to enforce it strictly. That procedure is contrary to our law, however, because a next friend cannot bind a minor to a contract for the payment of attorney's fees. Williams, 82 S.W.2d at 541; Shoughrue, 152 S.W.3d at 585. We need not consider the Ohio rule further.

question is not whether the contract amount is reasonable but rather what the reasonable fee would be in the absence of a contract.

Nonetheless, other factors in RPC 1.5(a) require the trial court to take into account the risks that an attorney must consider before deciding whether to accept representation in a case where the compensation will remain uncertain until the end of the case. "[T]he fee customarily charged in the locality for similar legal services" allows the trial court to consider, for example, that attorneys in a particular area typically accept personal injury actions on a contingent basis. See Tenn. Sup. Ct. R. 8, RPC 1.5(a)(3). The trial court may further consider that, in actions that attorneys accept on contingency, the fee should ordinarily be greater than in cases where the fee is fixed. See United Med. Corp., 703 S.W.2d at 136; Killingsworth, 104 S.W.3d at 534; accord Pellegrin, 605 F.3d at 246; Ex parte Peck, 572 So. 2d 427, 429 (Ala. 1990); Settlements of Betts, 687 N.E.2d at 1005. The trial court will also consider the novelty and difficulty of the questions and the skill required to perform the legal services. See Tenn. Sup. Ct. R. 8, RPC 1.5(a)(1). These considerations reflect what some other jurisdictions have described as the "risk of non-recovery" in determining a reasonable fee. See, e.g., Donnarumma, 79 F.R.D. at 467-69; T.S. ex rel. F.M., 53 So. 3d at 58; Settlements of Betts, 587 N.E.2d at 1002-03; Sneed, 681 P.2d at 757. Indeed, if the court did not consider such risk, then the analysis in such cases would likely result in unreasonably low fee awards that might soon dissuade attorneys from accepting the representation of minors.

The extent to which a court awards a greater fee because of the risk of non-recovery depends, however, on the facts of the individual case. Some cases present a greater or lesser risk of non-recovery than others, and a court should determine a reasonable fee based on the actual level of risk. For instance, in Pellegrin, the Fourth Circuit Court of Appeals vacated the trial court's reduction of the attorneys' compensation from one-third of an $18 million settlement down to three percent in a case involving a plaintiff severely and permanently brain-damaged after being struck by a vehicle.[29] 605 F.3d at 248-49. The court remanded for "a more rigorous analysis" of a list of twelve factors, including many found in our RPC 1.5(a), because the trial court had "reduced counsel's fee to a level that few attorneys would have accepted at the outset of litigation, when success was by no means assured and the size of any settlement or judgment was unpredictable." Id. at 246, 249. The court identified "a number of sticky problems" when the plaintiff's counsel took the case: the reservation of rights and refusal to defend by the defendant's insurer; the prospect of obtaining a verdict against a judgment-proof defendant; the possibility of a contributory negligence defense

---

[29] Although the plaintiff was an adult at the time of the injury, the Fourth Circuit's discussion of the applicable legal standard makes clear that it would apply the same principles whether the case involved a minor or an incompetent. See Pellegrin, 605 F.3d at 243.

completely barring recovery; and, because the plaintiff and defendant were co-workers, the risk that the suit would be transformed into an exclusive workers' compensation claim. Id. at 246-47. The Fourth Circuit reasoned that the trial court overemphasized the fact that the insurer ultimately settled the case for a large amount:

> By the time mediation and settlement occurred, the case may well have appeared open and shut, but that was only because [plaintiff's] attorneys had spent almost two years laying the groundwork to secure their client's interests. . . . *Successful outcomes often make risks seem less risky in hindsight than they were at the time*, and the court should not have ignored those risks merely because at some later point in litigation the defendant found it in its interest to settle.

Id. at 248 (emphasis added).

Where the risk of non-recovery is relatively low, however, courts may reach a different result, particularly where the best interests of minors are at stake. For instance, in T.S. ex rel. F.M., where the attorney represented a disabled minor severely burned in a whirlpool bath at a group home, the Alabama Supreme Court held that the trial court exceeded its discretion by awarding the attorney an unreasonably large one-third share of the minor's $737,000 recovery. 53 So. 3d at 59 & n.6. The court reasoned that the risk of non-recovery in the case was "negligible" because the case presented "compelling facts" and there was "limited" uncertainty regarding liability. Id. at 58. Within days of being served with the complaint, the group home's counsel contacted the attorney to propose a quick settlement through mediation. Id. at 58-59. The minor's attorney was already aware of the available insurance policy limits and did not have to undertake particularly thorough discovery. Id. at 59. Accordingly, although an attorney of comparable skill and experience in that locality would generally charge a forty percent contingency fee, the court reduced the fee award to twenty percent of the minor's recovery. Id. at 47, 59.

Likewise, in Settlements of Betts, where the attorneys settled an action on behalf of two minors struck by a drunk driver, the court of common pleas rejected counsel's request for one-third of the recovery and instead determined that one-fifth of each child's settlement was a reasonable fee. 587 N.E.2d at 1002, 1005. The court reasoned "there never was any risk . . . of a non-recovery" because counsel was able to obtain a policy limits recovery by submitting a demand letter to the insurer. Id. at 1004. Furthermore, because the policy limits were adequate to satisfy the injured minors' claims, counsel did not try to locate other

tortfeasors.[30]  Id.  Taken together, these cases establish that the trial court must consider the actual risks present in a given case before deciding whether and how much more or less an attorney should receive in a case where a contingent fee would customarily be charged.

Accordingly, we hold that a trial court should apply the factors set forth in RPC 1.5(a)(1)-(10) when determining a reasonable attorney's fee regardless of the client's age. However, where the client is a minor, the trial court should also bear in mind its special responsibility to protect minors' rights and best interests.  Therefore, the trial court shall not consider the fee agreement between the attorney and the minor's next friend, because any such agreement does not bind the minor.  In determining the fee, attorneys representing minors must, on the one hand, receive sufficiently reasonable fees to ensure that they have the necessary incentive to accept such cases in the future.  See Friends for All Children, 567 F. Supp. at 816; cf. Leonard C. Arnold, Ltd. v. N. Trust Co., 506 N.E.2d 1279, 1281 (Ill. 1987) (explaining that "the court's duty to protect minors is consistent with the policy of promoting access to the courts through reasonable" fee awards).

On the other hand, minors are in no position to judge the value of legal services rendered on their behalf.  Any award of attorney's fees necessarily depletes funds paid for the benefit of the minor, who depends on the net recovery to compensate for injuries that often have long-term consequences.  See Donnarumma, 79 F.R.D. at 459; cf. Settlements of Betts, 587 N.E.2d at 999 (describing ongoing physical limitations of minor victims who were struck by a vehicle); Settlement/Guardianship of AGM, 223 P.3d at 1279 (discussing guardian ad litem's opinion that settlement net the requested attorney's fee would be insufficient to compensate the minor for her injuries).  Therefore, the trial court should have regard for the minor's present and future needs when it rigorously analyzes the RPC 1.5 factors in a particular case.  The experience of our Court of Appeals and courts in other jurisdictions establishes that the factors currently set forth in the rule are sufficient for courts to protect the best interests of minors.[31]

_____

[30] In White, this Court relied on similar principles to affirm the lower courts' refusal to enforce an attorney's one-third contingency agreement in a probate action to recover the client's share from the estate of the client's estranged wife.  937 S.W.2d at 801.  While White did not involve a minor and the attorney ultimately received no fee because of an ethical violation, its reasoning illustrates the problem with not considering the specific risks in a given case.  This Court explained that the case was neither "terribly complicated or novel" nor required particular skill.  Id.  Furthermore, the attorney lacked particular expertise in the subject matter and was not precluded from undertaking other employment.  Id.  Finally, this Court concluded that the attorney did not achieve a good result, as the client died without receiving anything from his estranged wife's estate.  Id.  Because the one-third fee was so "clearly excessive" that the attempt to collect it amounted to a violation of DR 2-106, the lower courts' fee award was reversed.  Id. at 803.

[31] Applying this holding, the Court of Appeals' ruling in the First Appeal was correct.  The trial court
(continued...)

In terms of procedure, the trial court should develop an evidentiary record, make findings concerning each of the factors, and then determine a reasonable fee that "depend[s] upon the particular circumstances of the individual case." White, 937 S.W.2d at 800. To enable appellate review, trial courts should clearly and thoroughly explain the particular circumstances and factors supporting their determination of a reasonable fee in a given case. See Hoffert, 656 F.2d at 166 (finding no abuse of discretion in fee award to attorney representing minor tort victim where trial court considered each of the DR 2-106 factors and provided factual findings, "fully supported by the record," that were "sufficiently detailed to permit appellate review"); Ex parte Peck, 572 So. 2d at 429 ("A reviewing court must be able to ascertain from the record what factors the trial court considered in awarding the attorney fee.").

Our holding is in no way intended to dissuade a minor's next friend from obtaining legal services on the minor's behalf. The attorney and next friend should simply recognize that the court will disregard any agreement concerning fees and set a reasonable fee at the conclusion of the case. In this case, Dunaway's agreement with Father contained a provision acknowledging that the court would determine the fee if a claim was made on an infant's behalf and where law required. Given Tennessee law, this provision is particularly appropriate in any agreement between a next friend and an attorney for legal services on a minor's behalf.

In summary, we hold that no single factor found within RPC 1.5 merits special emphasis over the other factors in determining a reasonable fee in cases involving a minor, and we decline to add other factors. Instead, the trial court may conclude that certain factors merit greater weight under the unique circumstances of a particular case. Here, in relying on the RPC 1.5 factors to determine a reasonable fee, the trial court applied the correct legal standard. That leaves us only to consider whether the trial court's fee award was illogical, based on a clearly erroneous assessment of the evidence, or an injustice to Kaitlyn.

*Whether the Decision Was Illogical, Clearly Erroneous, or an Injustice*

After conducting the hearing upon remand following the First Appeal, the trial court determined that $131,000 would be a fair and reasonable fee for the legal services that Dunaway rendered on Kaitlyn's behalf. As Romer points out, the trial court's fee award

---

[31](...continued)
indeed erred in concluding that Father's one-third contingent fee agreement with Dunaway was the primary factor dictating the fee award in this case. That fee agreement did not bind Kaitlyn. Williams, 82 S.W.2d at 541; Shoughrue, 152 S.W.3d at 585.

compensates Dunaway at an effective rate of $1,021.84 per hour.[32] The effective hourly rate is more than five times greater than the rate of $200 per hour typically charged in Fentress County and thus borders on an amount this Court has deemed "clearly excessive" in the context of a fee award involving an adult plaintiff. See White, 937 S.W.2d at 801 (noting that fee contract, if enforced, would compensate attorney at more than six times the upper end of the hourly fee customarily charged in the locality). This large number gives us pause, and we must determine whether awarding such a large fee is, under the particular circumstances of this case, illogical, clearly erroneous, or an injustice to Kaitlyn.

The record indicates that Dunaway's legal services are in high demand in the locality where he practices, and he is able to command above-market rates for those services. The trial court agreed that Dunaway tries the most jury cases of any plaintiff's attorney in the Eighth Judicial District. In hourly litigation, Dunaway charges $400 per hour, at least double the typical rate in Fentress County. To Dunaway's knowledge, at the time of the remand hearing, no other attorney in the entire Eighth Judicial District charged an hourly rate that high. While the parties stipulated that Fentress County attorneys customarily accept personal injury cases on a contingency basis, and while an attorney's fee is usually higher in a contingency case, see United Med. Corp., 703 S.W.2d at 136; Killingsworth, 104 S.W.3d at 534, the trial court's fee award compensates Dunaway at an effective hourly rate more than two-and-a-half times his usual, uniquely high fee.

In analyzing whether the trial court abused its discretion in awarding the $131,000 fee, we return to the result Dunaway obtained in this case. As the trial court found, Dunaway obtained a greater recovery from Grandmother's estate than if he had merely settled the case for policy limits. To be precise, the $425,000 settlement is eight-and-a-half times greater than the $50,000 limits of Grandmother's liability insurance policy. Furthermore, the attorney's fee awarded to Dunaway at the remand hearing is less than thirty-five percent of the $375,000 difference between the settlement obtained at mediation and the insurance policy limits. In addition to obtaining the settlement, Dunaway negotiated to reduce BCBS's subrogation interest to a little more than a third of the original amount. Even after deducting expenses and fees from the settlement (including the fee award at issue here), Kaitlyn's net recovery is approximately four-and-a-half times the limits of Grandmother's liability policy. The trial court found that, because of the "very good" result that Dunaway obtained, Kaitlyn

---

[32] To compute this figure, the attorney's fee award of $131,000 is divided by 128.2 hours. The parties agree that 128.2 hours is the correct number of hours if one excludes the duplicate entry on Dunaway's affidavit and the hours spent litigating the Overton County Juvenile Court petition, but includes the hours spent litigating the Fentress County Chancery Court petition. We agree with the Court of Appeals' conclusions in the Second Appeal that the trial court did not err in deciding which hours to exclude or include in determining the fee. See Wright, 2009 WL 3246459, at *4.

will "be in pretty good shape when she reaches the age of majority." However, the trial court made this finding in the absence of evidence about the extent of Kaitlyn's recovery from her injuries.

Dunaway's affidavit establishes that he spent over a year on the case, making preparations to go to trial, if necessary. After determining that the extent of Kaitlyn's damages far exceeded the available insurance proceeds, Dunaway spent much of his time and labor locating "deep pockets" adequate to compensate Kaitlyn for her injuries and actually obtaining that recovery. Because Grandmother's estate was not liquid, Dunaway reviewed property records to determine the real estate holdings. He also appeared in Fentress County Chancery Court to advise the chancellor of Kaitlyn's personal injury claim and to prevent the unsupervised private sale of the real properties in Grandmother's estate. While the resolution did not come quickly, Dunaway achieved this result through mediation and settlement, soon enough to avoid the uncertain outcome and additional hours associated with trial.[33]

We note that the case did not present an extraordinarily high degree of novelty or difficulty. The trial court found that other, less experienced attorneys might have settled the case at insurance policy limits, but it was hardly an original strategy for Dunaway to look to the assets of Grandmother's estate upon discovering the inadequate insurance coverage. Grandmother's property, though not liquid, was available and attachable. Dunaway engaged in a diligent yet relatively straightforward investigation to increase the amount of Kaitlyn's recovery.

However, at the beginning of the case, Dunaway could not have known what he would ultimately recover on Kaitlyn's behalf. When investigating Grandmother's estate, he could have discovered just as easily that the estate had minimal assets. "Successful outcomes often make risks seem less risky in hindsight than they were at the time," Pellegrin, 605 F.3d at 248, and we must remain mindful of those risks when determining what is a reasonable fee at the conclusion of the litigation.

In final analysis, given that the effective hourly rate of Dunaway's fee award is so high, we almost certainly would have awarded a lesser amount if we were reviewing Dunaway's fee request de novo. We recognize that the trial court considered the existence of the contingent fee agreement and cited the fee "arrangements" as one of several bases for the fee award, a practice which we have now annulled. Nonetheless, the court properly acknowledged that a next friend's contract for attorney's fees would not bind a minor and

---

[33] If Dunaway had risked the uncertainty, taken the case to trial, and obtained the same recovery, we might not be having this in-depth discussion about whether Dunaway's fee award causes an injustice to Kaitlyn, because the additional hours spent trying the case would have reduced the effective hourly rate.

permissibly weighed as an "important" factor the parties' stipulation concerning the fee customarily charged in the locality for similar legal services. <u>See</u> Tenn. Sup. Ct. R. 8, RPC 1.5(a)(3). The court also made findings as to all the other RPC 1.5(a) factors based on Dunaway's testimony and the exhibits admitted into evidence, and ultimately awarded Dunaway a fee equal to 30.8% of the $425,000 settlement, less than one-third of Kaitlyn's recovery. Thus, we are persuaded that the record contradicts Romer's assertion that the trial court simply upheld the contingent fee agreement in determining the fee at the remand hearing.[34]

We reiterate that our courts—both appellate and trial alike—have the responsibility to consider a minor's best interests. <u>Nashville Trust Co.</u>, 270 S.W.2d at 475; <u>Wilson</u>, 11 Tenn. App. at 336. However, recognizing that the appropriate inquiry is whether the trial court abused its discretion, we decline to substitute our judgment for that of the trial court. Given the result that Dunaway obtained in the case, the extent to which that result actually benefits Kaitlyn, the labor Dunaway invested to obtain that result, and the discretion we accord to the trial judge, we cannot say that the fee award is illogical, clearly erroneous, or an injustice to Kaitlyn.

Accordingly, we affirm the trial court's $131,000 fee award to Dunaway for services rendered on Kaitlyn's behalf. This fee award is $10,666.66 less than the trial court originally awarded prior to reversal in the First Appeal. The trial court has already ordered Dunaway to return $10,000 of the original fee award to Father, as Kaitlyn's parent and next friend, and Father has been ordered to apply that amount to the payment of Romer's guardian ad litem fee. We affirm that judgment and order Dunaway to return the remaining $666.66 of the original fee award to Father, as Kaitlyn's parent and next friend. Father may apply this amount to pay court costs or invest it with the other settlement proceeds on Kaitlyn's behalf.[35]

---

[34] The record before the trial court and the trial court's analysis were not without their flaws. In particular, regarding the fees customarily charged in the locality, <u>see</u> Tenn. Sup. Ct. R. 8, RPC 1.5(a)(3), the parties stipulated to the fees for contingency-based personal injury cases involving adult plaintiffs and for hourly work. They reached no agreement, however, regarding personal injury cases involving minor plaintiffs. The record would have been stronger if Dunaway and/or Romer had submitted additional testimony concerning the fee customarily considered reasonable in such cases. Also, with respect to the nature and length of the professional relationship with the client, <u>see id.</u> RPC 1.5(a)(6), we note that the trial court analyzed Dunaway's relationship with Father, the parent and next friend, rather than Dunaway's relationship with Kaitlyn, his client in the case. These shortcomings in the record are not enough, however, to conclude that the trial court abused its discretion.

[35] Although we ultimately affirm the judgment of the lower courts, we commend Romer for his performance as guardian ad litem in this case. In pursuing this sensitive issue of challenging another

(continued...)

## CONCLUSION

An adult serving as next friend for a minor plaintiff cannot bind the minor to a contract with counsel for the amount of the attorney's fee. To determine a reasonable fee for an attorney representing a minor, we hold that courts should analyze the ten factors set forth in Tennessee Supreme Court Rule 8, Rule of Professional Conduct 1.5(a). Additionally, courts should be mindful of their particular responsibility to protect the minor's best interests. We decline to emphasize specific factors or require other factors in the analysis.

In this case we hold that the trial court, upon remand from the Court of Appeals, did not abuse its discretion in awarding attorney Dunaway a $131,000 fee for services rendered in this case on behalf of Kaitlyn Lee Wright  Therefore, we affirm the judgment of the Court of Appeals. We order attorney Dunaway to reimburse the extra $666.66 remaining from the original fee award to David Lee Wright, as parent and next friend of Kaitlyn Lee Wright, for the payment of court costs or investment with the settlement proceeds. Costs of this appeal are taxed to the appellant, Kaitlyn Lee Wright, and her surety, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, CHIEF JUSTICE

---

[35](...continued)
attorney's fee in order to clarify the rule applicable to such cases, he has acted both in the best interests of the child and in the finest traditions of the bar.